865 F.2d 1260
Unpublished Disposition
 NOTICE: Fourth Circuit I.O.P. 36.6 states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Fourth Circuit.
UNITED STATES of America, Plaintiff-Appellee,
v.
Francisco C. ASTORGA, Defendant-Appellant.
UNITED STATES of America, Plaintiff-Appellee,
v.
John Joseph ROUSH, Defendant-Appellant.
UNITED STATES of America, Plaintiff-Appellee,
v.
Luis TANG-FORTALECHE, Defendant-Appellant.
UNITED STATES of America, Plaintiff-Appellee,
v.
Lucas Gerrardo Caballero SALINAS, a/k/a Robertito, a/k/a
Robert, a/k/a Roberto, Defendant-Appellant.
UNITED STATES of America, Plaintiff-Appellee,
v.
Phillip Salvador MANTECON, a/k/a Phillip Salvador Mantecon,
Jr., Defendant- Appellant.
UNITED STATES of America, Plaintiff-Appellant,
v.
Lucas Gerrardo Caballero SALINAS a/k/a Robertito, a/k/a
Robert, a/k/a Roberto, Defendant-Appellee.
UNITED STATES of America, Plaintiff-Appellee,
v.
Bernardo Segundo CALLEJA a/k/a Beni, Defendant-Appellant.
UNITED STATES of America, Plaintiff-Appellee,
v.
Carlos Rafael CALLEJA, Defendant-Appellant.
UNITED STATES of America, Plaintiff-Appellee,
v.
Felipe Salvador MANTECON, a/k/a Phillip Salvador Mantecon,
Sr. Defendant- Appellant.
 Nos. 87-5018 to 87-5020, 87-5023, 87-5024, 87-5037, 87-5042,
87-5043 and 87- 5091.
 United States Court of Appeals, Fourth Circuit.
 Argued: June 6, 1988.
Decided: Jan. 6, 1989.
 
 Stephen H. Sachs (Richard J. Oparil, Wilmer, Cutler & Pickering, on brief); Gary L. Lumsden; Vincent R. Alto; Harry F. Hambrick, Jr.; John Gregory, Jr.; Stephen A. LeClair (Alvin E. Entin, Entin, Schwartz, Barbakoff & Schwartz on brief); Jonathan M. Apgar (Willis, Damico & Apgar on brief); Loren H. Cohen (William R. Tunkey, Benjamin S. Waxman, Weiner, Robbins, Tunkey & Ross, P.A. on brief), for appellants.
 Richard Wilcox Pierce, Assistant United States Attorney (John P. Alderman, United States Attorney, on brief), for appellee.
 Before DONALD RUSSELL, ERVIN and CHAPMAN, Circuit Judges.
 CHAPMAN, Circuit Judge:
 
 
 1
 These appeals present a complex factual picture because there are presently eight appellants[1] who were charged with violating a number of federal drug statutes. Some of the defendants were charged and have been convicted of violating more than one such statute, and each appellant was charged and convicted under Count One of the superseding indictment of conspiring to import into the United States more than one kilogram of cocaine, a Schedule II narcotic controlled substance, in violation of 21 U.S.C. Sec. 952(a). Most of the appellants challenge the sufficiency of the evidence to convict them, and a majority of the appellants claim that a prejudicial atmosphere pervaded the trial because of the massive media coverage, both before and during the trial, and the extensive security measures taken during the trial. Other appellants have presented issues that relate only to them individually.
 
 
 2
 The United States has filed a cross appeal claiming error by the trial judge in granting a judgment of acquittal to Lucas Gerrardo Caballero-Salinas (hereinafter "Caballero") following his conviction under Count Fourteen of engaging in a continuing criminal enterprise in violation of 21 U.S.C. Sec. 848.
 
 
 3
 After a searching review of the record and the law, we find that the trial judge erred when he granted Caballero's motion for acquittal as to Count Fourteen. We affirm all of the remaining convictions. The sentences of Bernardo Calleja and Carlos Calleja on the conspiracies alleged in Counts One and Seven are set aside under our decision in United States v. Porter, 821 F.2d 968 (4th Cir.1987), because each Calleja was convicted of a Continuing Criminal Enterprise offense, and as we stated in Porter: "Congress did not intend that an individual be punished under both Sec. 846 (conspiracy) and Sec. 848 (Continuing Criminal Enterprise)." Id. at 978.
 
 
 4
 * The trial of this case began on November 10, 1986, and on December 12, 1986, the jury returned verdicts as follows:
 
 
 5
 Miguel Alvarez: Guilty as to--
 
 
 6
 Count Seven--conspiracy to distribute more than one kilogram of cocaine in violation of 21 U.S.C. Secs. 841 and 846.
 
 
 7
 Count Thirteen--possession with intent to distribute approximately 50 kilograms of cocaine in violation of 21 U.S.C. Sec. 841(a).
 
 
 8
 Francisco C. Astorga: Guilty as to--
 
 
 9
 Count One--conspiracy to import into the United States more than one kilogram of cocaine in violation of 21 U.S.C. Secs. 952(a) and 963.
 
 
 10
 Lucas Gerrardo Caballero Salinas: Guilty as to--
 
 
 11
 Count One--conspiracy to import more than one kilogram of cocaine into the United States in violation of 21 U.S.C. Secs. 952(a) and 963.
 
 
 12
 Count Seven--conspiracy to possess with intent to distribute more than one kilogram of cocaine in violation of 21 U.S.C. Secs. 841 and 846.
 
 
 13
 Count Eight--distribution of approximately 342 kilograms of cocaine in violation of 21 U.S.C. Sec. 959(a).
 
 
 14
 Count Nine--importing approximately 318 kilograms of cocaine into the Western District of Virginia in violation of 21 U.S.C. Sec. 952(c).
 
 
 15
 Count Fourteen--engaging in a continuing criminal enterprise in violation of 21 U.S.C. Sec. 848.
 
 
 16
 Bernardo Segundo Calleja: Guilty as to--
 
 
 17
 Count One--conspiracy to import more than one kilogram of cocaine in violation of 21 U.S.C. Sec. 952(a) and 963.
 
 
 18
 Count Three--interstate travel to carry on a business enterprise involving cocaine in violation of 18 U.S.C. Sec. 1952.
 
 
 19
 Count Five--use of a communication facility to facilitate the importation of cocaine in violation of 21 U.S.C. Sec. 843.
 
 
 20
 Count Six--another use of communication facility charge.
 
 
 21
 Count Seven--conspiracy to possess with intent to distribute more than one kilogram of cocaine in violation of 21 U.S.C. Secs. 841 and 846.
 
 
 22
 Count Nine--importing into the Western District of Virginia approximately 318 kilograms of cocaine in violation of 21 U.S.C. Sec. 952(c).
 
 
 23
 Count Eleven--interstate travel to promote a business enterprise involving cocaine in violation of 18 U.S.C. Sec. 1952.
 
 
 24
 Count Twelve--another interstate travel count.
 
 
 25
 Count Thirteen--possession with intent to distribute approximately 50 kilograms of cocaine in violation of 21 U.S.C. Sec. 841(a).
 
 
 26
 Count Fifteen--engaging in a continuing criminal enterprise in violation of 21 U.S.C. Sec. 848.
 
 
 27
 Carlos Rafael Calleja: Guilty as to--
 
 
 28
 Count One--conspiracy to import into the United States more than one kilogram of cocaine in violation of 21 U.S.C. Secs. 952(a) and 963.
 
 
 29
 Count Three--interstate travel to promote a business enterprise involving cocaine in violation of 18 U.S.C. Sec. 1952.
 
 
 30
 Count Seven--conspiracy to possess with intent to distribute more than one kilogram of cocaine in violation of 21 U.S.C. Secs. 841 and 846.
 
 
 31
 Count Nine--importation into the Western District of Virginia approximately 318 kilograms of cocaine in violation of 18 U.S.C. Sec. 1952.
 
 
 32
 Count Thirteen--possession with intent to distribute approximately 50 kilograms of cocaine in violation of 21 U.S.C. Sec. 841(a)
 
 
 33
 Count Sixteen--engaging in a continuing criminal enterprise in violation of 21 U.S.C. Sec. 848.
 
 
 34
 Felipe Salvador Mantecon: Guilty as to--
 
 
 35
 Count One--conspiracy to import more than one kilogram of cocaine in violation of 21 U.S.C. Sec. 952(a) and 963.
 
 
 36
 Count Seven--conspiracy to possess with intent to distribute more than one kilogram of cocaine in violation of 21 U.S.C. Secs. 841 and 846.
 
 
 37
 Count Twelve--interstate travel to promote a business enterprise involving cocaine in violation of 18 U.S.C. Sec. 1952.
 
 
 38
 Count Thirteen--possession with intent to distribute approximately 50 kilograms of cocaine in violation of 21 U.S.C. Sec. 841(a).
 
 
 39
 Phillip Salvador Mantecon: Guilty as to--
 
 
 40
 Count One--conspiracy to import more than one kilogram of cocaine in violation of 21 U.S.C. Sec. 952(a) and 963.
 
 
 41
 Count Three--interstate travel to promote a business enterprise involving cocaine in violation of 18 U.S.C. Sec. 1952.
 
 
 42
 Count Seven--conspiracy to possess with intent to distribute more than one kilogram of cocaine in violation of 21 U.S.C. Secs. 841 and 846.
 
 
 43
 John Joseph Roush: Guilty as to--
 
 
 44
 Count One--conspiracy to import more than one kilogram of cocaine in violation of 21 U.S.C. Secs. 952(a) and 963.
 
 
 45
 Luis Tang-Fortaleche: Guilty as to--
 
 
 46
 Count One--conspiracy to import more than one kilogram of cocaine in violation of 21 U.S.C. Secs. 952(a) and 963.
 
 
 47
 Count Nine--importation into the Western District of Virginia approximately 318 kilograms of cocaine in violation of 21 U.S.C. Sec. 952(c).
 
 
 48
 Carl Allen Warmack: Guilty as to--
 
 
 49
 Counts One, Two, Seven and Ten--these are being handled in a separate appeal.
 
 
 50
 The Drug Enforcement Administration successfully infiltrated two large cocaine organizations through the efforts of Donald O. Lincoln, an experienced agent and an able pilot. He worked his way into a position in which he would provide air transportation from Bolivia and Panama to Virginia for large quantities of cocaine originated by Roberto Suarez in Bolivia. The drugs were to be distributed by Bernardo Calleja and Carlos Calleja in the United States.
 
 
 51
 Lincoln was officially stationed in Richmond, Virginia, and he wanted the final destination of the drugs to be nearby. The Callejas liked the Virginia delivery, because most of the cocaine was destined for New York City. During the course of his investigation and contact with the appellants, Lincoln recorded many telephone conversations and filmed by video camera meetings in a motel room in Panama and in a farmhouse in Bath County, Virginia. Lincoln was the chief witness for the government, but there were other agents involved in the undercover operation.
 
 
 52
 Carl Warmack introduced Bernardo Calleja and Carlos Calleja to Donald Lincoln, who was then posing as the president of an air service that could fly cocaine from Colombia or Bolivia through Panama and into the United States. At this meeting, and another meeting shortly thereafter, the Callejas requested Lincoln to go to Panama and establish an air service for their use. In addition to the Callejas, Phillip Mantecon, John Roush and Carl Warmack were in attendance. The Callejas advised Lincoln that they were willing to pay a fee of $5,000 per kilogram of cocaine transported from Bolivia and that their associate Andres was in Bolivia setting up the deal.
 
 
 53
 The Calleja brothers were partners in the importation and distribution of marijuana and cocaine. They operated from South Florida and used various persons to arrange for a supply of cocaine and marijuana from South America. They usually obtained transportation by boat or aircraft to the United States, and they had recently contracted with Gerrardo Caballero of Bolivia to import large quantities of cocaine originating in Bolivia through the efforts of Caballero and his father-in-law, Roberto Suarez. Caballero was educated in the United States, had a degree in agribusiness, and spoke English well. About two years before the first meeting of the Callejas with Lincoln, Caballero had begun directing the Suarez cocaine business. He worked through Roger Martinez in Miami and he wished to set up a line of distribution which would bypass Colombian buyers and importers. In 1984 and 1985, Caballero traveled to Panama and the United States on numerous occasions and began the negotiations between Caballero and the Callejas. It was in furtherance of this plan that the Callejas wanted to employ Lincoln as their source of transportation and importation of cocaine into the United States.
 
 
 54
 After the December 1985 meeting with the Callejas, Lincoln flew to Panama and Bernardo Calleja soon followed. Carlos Calleja flew with Carl Warmack, Phillip Mantecon and John Roush to Roanoke, Virginia to check out the airfield and the farm in Bath County where the drugs were to be unloaded.
 
 
 55
 On the first trip to Panama no cocaine was transported by Lincoln, but Bernardo Calleja paid $15,000 to Lincoln's pilot and upon returning to Miami on December 20, 1985, Carlos Calleja gave Lincoln $10,000 and Frank Astorga, an associate of the Callejas, gave Lincoln $10,000 and an ounce of cocaine. Later the same month, Warmack sent Lincoln $11,000 in cashier's checks, money Warmack owed the Callejas for cocaine.
 
 
 56
 In early January 1986, Bernardo Calleja requested Lincoln to come to Miami and consider buying a house that Bernardo had built for approximately $500,000. On this trip Lincoln was taken by the Callejas to Astorga's house and then driven to a house on Biscayne Bay Terrace. The house and grounds were elaborate and Bernardo forwarded to Lincoln a deed to the property, a note and deed of trust to be used in the purchase by Lincoln. Bernardo Calleja wanted to sell this house because he had a mortgage on it which had not been paid by an associate because the associate had gone to jail.
 
 
 57
 On January 14, 1986, Lincoln returned to Panama at the request of Bernardo Calleja to fly a load of cocaine from Bolivia and another load from Colombia. Calleja advised Lincoln that he and Luis Tang-Fortaleche, an associate in Panama, were trying to arrange cocaine purchases through Colombian sources. Lincoln remained in Panama for approximately six weeks and was paid by the Callejas through Tang. Bernardo Calleja continued to assure Lincoln that there was going to be plenty of business, but it was going to take time because Colombian cocaine suppliers would not front him a load of cocaine and the negotiations in Bolivia were taking time. During this time, Bernardo Calleja introduced Lincoln to Luis Castanon, who took one of Lincoln's pilots, Tom Warner, to Colombia to inspect an intended airstrip.
 
 
 58
 In late January, Bernardo advised Lincoln that a representative of the Suarez family named George had come to inspect Lincoln's aircraft. Undercover agent Douglas Driver testified that he went with George to the airport to inspect the plane. Bernardo went along. Later, Caballero told Driver that he had sent George to Panama to check out the team in Panama to see if there were any members of the DEA. On January 30, Bernardo told Lincoln that he was leaving Panama for Miami and would complete the sale of the pending cocaine shipment to individuals in New York. Before he left, Bernardo gave Lincoln another $10,000 and advised him that within a few days a son of Roberto Suarez would arrive to discuss the operation. On February 1, Tang introduced Lincoln to one Fernandez and shortly thereafter Fernandez introduced Lincoln to Caballero, who was at that time introduced as Robert Suarez. Caballero introduced his pilot, Gonzalo Vargas, and Vargas and Tom Warner discussed the best route out of Bolivia and the need for flying over the Amazon. Caballero wanted Gonzalo to fly with Warner, and he advised Lincoln that the details regarding payment for the cocaine would be worked out shortly with Bernardo Calleja and that the cocaine would be packaged in kilo quantities wrapped in polyurethene. Caballero asked about Lincoln's aircraft and his contacts in Panama. Caballero stated that he was personally responsible for the entire expense associated with the venture and that he was allowing Fernandez, Bernardo Calleja, Roger Martinez and Andres to sell the cocaine. There was a delay in the financial arrangements and Caballero left Panama. A week later Lincoln heard from him and Caballero was in Peru. During this period, the Callejas told Lincoln that Phillip Mantecon was coming to Panama and would introduce him to another supplier. On Mantecon's arrival he met with Lincoln and described his trip to Virginia in December.
 
 
 59
 In late February 1986, Caballero called Lincoln and advised that he was financing the operation and that if Lincoln waited a little longer, he would find the association profitable on a long term basis. Caballero asked Lincoln to stay in touch with Fernandez because of difficulties in placing telephone calls from Bolivia. Telephone records showed 43 calls from Fernandez to the Caballero number between mid-December 1985 and late March 1986. In late February, Bernardo advised Lincoln that Luis Castenon would be arriving to arrange a Colombian load. Castenon arrived with a guide pilot named Orlando Arenis, and with Tang, they worked with Lincoln and Warner on a trip to Medellen, Colombia. This trip never materialized and on February 28, 1986, Lincoln and Warner flew with Castenon to Miami and met Phillip Mantecon, Felipe Mantecon and Bernardo. At this meeting Castenon reported to Bernardo the loss of certain cocaine and the anticipated arrival of 30,000 pounds of marijuana. During February, Lincoln received three payments from Tang totaling $20,000. This money was from the Callejas, and in early March the Callejas sent another $8,000 to Lincoln by money order.
 
 
 60
 In March, Fernandez went to Bolivia and later returned with Caballero's guide pilot and instructions from Caballero, but there was some confusion and Fernandez left the guide pilot in Panama. On March 29, 1986, Caballero came to Panama and during conversations advised Lincoln that while Fernandez was in Bolivia, he had shown him his fields, ranch, laboratory and plantation system. Fernandez had gone to Miami. There he met Bernardo Calleja and received cashier's checks totaling $2,050,000. These checks were payable only after delivery of the cocaine. Caballero had Lincoln place $1,250,000 of these checks for collection through a bank account Lincoln had opened in Panama. Although Caballero knew that the checks were not guaranteed until the cocaine was delivered, he wanted to convince his father-in-law, Roberto Suarez, that the checks had been issued by a bank, and he used a banker, Antello, to contact his father-in-law. On April 1, 1986, at Caballero's direction, Lincoln sent his pilot Warner to the Suarez ranch in Bolivia with Gonzalo Vargas acting as guide. Caballero stayed in contact with Suarez through a radio-telephone hookup in Santa Cruz. Warner met Suarez and the cocaine was allowed to leave after assurances were given about the checks. Warner flew 342 kilograms of 91% pure cocaine from Bolivia to Panama on April 3, 1986 and the cocaine was transferred to another plane for shipment to Virginia. This cocaine, less 24 kilos which were kept in Panama, was flown to Miami and then to Bath County, Virginia for delivery to the Callejas. After the plane left Panama for the United States, Panamanian police arrested Caballero and Tang and turned them over to the DEA for transfer to the United States. Tang was arrested when he came to pick up a kilo of cocaine. Caballero had intended to come to the United States to oversee the distribution and to arrange for the delivery of money to Lincoln for transport back to Bolivia.
 
 
 61
 Bernardo and Carlos Calleja traveled from Miami to Roanoke, and they arranged to have $100,000 brought from Miami by George Rodriquez and Felipe Mantecon to pay the pilots. Only $94,750 arrived. Mantecon and Rodriquez were to take some cocaine to Florida for the Callejas, and Miguel Alvarez and Bernardo Calleja were to take cocaine to Richmond and New York. The Callejas, Miguel Alvarez, Felipe Mantecon, Jorge Rodriguez and Carl Warmack were arrested at the time of delivery of a part of the cocaine.
 
 II
 
 62
 Appellants claim that the trial judge abused his discretion by not changing the venue of the trial and by not sequestering the jury during the trial because of the extensive media coverage of the arrest of the appellants and the trial. There is also a claim of error because the trial judge did not conduct a more thorough voir dire examination of the venire. The appellants also claim that the judge, after the trial began, did not thoroughly admonish the jury at each lunch and evening recess to refrain from discussing the case or reading or watching any news reports of the trial.
 
 
 63
 The quantity of the cocaine seized and the location of such seizure, a rural area in southwest Virginia, created an unusual story for the local media. Roanoke is not Miami, and the people and the press of the area were naturally interested in the case. However, local interest and the unusual setting will not justify publicity, either pretrial or during trial, that is so massive, pervasive and prejudicial as to prevent the defendants from receiving a fair trial. Sheppard v. Maxwell, 384 U.S. 333 (1965). We have reviewed the material submitted by the appellants on this issue and we find no abuse of discretion by the trial judge in not changing the venue and in not sequestering the jury during the trial.
 
 
 64
 Only one defendant filed a motion for a change of venue, and this motion was not called to the attention of the trial court until the entire venire had been questioned by the judge. This was a rather half-hearted effort because the attorney stated to the court that he did not think the motion would be granted. The motion was buttressed by very little in the way of supporting evidence; only a few stories from newspapers and some newspaper photographs were attached as exhibits.
 
 
 65
 When we view this question on appeal, with all the evidence of media coverage that has been made available to us, we cannot say that the totality of the circumstances raises the probability of prejudice to the defendants.
 
 
 66
 The trial judge conducted an adequate voir dire of the prospective jurors. His examination was sufficient to reveal and evaluate any question of prior knowledge of the facts or any prejudice or preconception of a venire person exposed to pretrial publicity. The venire of seventy-eight was divided into groups of twenty-one or less so that the examination could be more easily conducted and understood. The judge asked each of these groups if they had read about or heard about the case, if they could put aside anything they might have heard or read and decide the case only upon the evidence presented in the courtroom, and said that regardless of what they may have read or heard, those accused started with a clean slate and were presumed innocent. He also advised the venire that if any one had such strong feelings about cocaine and its use that they could not give the defendants a fair trial, they should advise the court. He also inquired as to whether the prospective jurors would be able to give a fair trial to citizens of foreign countries and to persons who could not speak English. He inquired if any person on the venire spoke Spanish, Dutch or Portuguese. He also asked if they would follow the court's instructions on the law, particularly on the defenses of entrapment and coercion.
 
 
 67
 At the request of the attorneys for several defendants, the court directed questions to individual venire persons. The court excused sua sponte three members of the venire for cause. This was done without objection. Approximately one-third of the seventy-eight persons on the venire had heard nothing of the case prior to coming to court.
 
 
 68
 The judge then gave the defendants a total of fifty-three peremptory challenges, which could be exercised collectively. The government was given eight challenges. Defense attorneys were also allowed to select the two alternate jurors after the list had been reduced to fourteen in number. There was no objection by the defendants to the jury as drawn. We find that the examination and selection of the jury was sufficient to reveal any evidence of prejudice due to pretrial publicity or the unusual security precautions, and we find no error or abuse of discretion on this claim.
 
 
 69
 Bernardo Calleja, after the trial commenced, moved to sequester the jury for the duration of the trial on the ground that, because of the publicity surrounding the trial, sequestration was the only way to assure the defendants a fair trial, and to prevent the jurors from reading or seeing the news reports of the trial. The trial judge denied this motion and found sequestration unnecessary. The court found that the jurors were intelligent and that they would abide by the court's instructions not to read, listen or watch anything that the media might report about the trial. This motion was orally made, and it was not supported by any exhibits, affidavits or evidence of undue media coverage.
 
 
 70
 Sequestration of a jury is within the sound discretion of the trial court, U.S. v. Persico, 832 F.2d 705, 718 (2d Cir.1987), and we find no abuse of discretion by the district judge in refusing to sequester the jury during the trial.
 
 
 71
 All through the trial there were repeated instructions to the jury by the trial judge not to read, watch or listen to anything about the trial and not to discuss it with anyone or allow it to be discussed in their presence. The jurors were admonished that if they should learn of any violations of this instruction, they should immediately report such violation to the court. Appellants complain that the court did not give these instructions at every lunch and evening recess during the lengthy trial. From a review of the transcript, it does appear that there were some recesses when these instructions were not given, but such instructions were given so often during the course of the trial that the jurors were constantly aware of their obligation as jurors. There has been no showing, or even an attempt at a showing, that any juror disobeyed or disregarded these instructions.
 
 
 72
 Appellants contend that they were denied a fair trial because of the excessive security in the courtroom, around the courthouse, and in the transporting of them to and from the courthouse. They contend that this gave the false impression that they were violent and dangerous. However, there were no complaints to the trial judge about the security measures, and the issue is not properly before us. We have looked at this claim, and we find nothing unusual or prejudicial about the use of metal detectors in a federal courthouse. These devices are used on a daily basis in almost every courthouse in this circuit.
 
 
 73
 The defendants were not restrained in any way during the course of the trial and the presence of deputy United States marshals, who were wearing business suits, did not create an atmosphere of excessive security. It is not prejudicial to a defendant for the United States Marshal to be prepared. It is one of his duties to provide for the safety and security of the court and of those in attendance. Those maintaining security in the courtroom were not uniformed and armed state troopers as in Holbrook v. Flynn, 475 U.S. 560 (1985), but they were in business suits without any weapons showing. At page 570, Holbrook states the rule:
 
 
 74
 Whenever a courtroom arrangement is challenged as inherently prejudicial, therefore, the question must be not whether jurors actually articulated a consciousness of some prejudicial effect, but rather whether "an unacceptable risk is presented of impermissible factors coming into play," Williams, 425 U.S. at 505.
 
 
 75
 Holbrook also found that even if there was a slight degree of prejudice because of the uniformed, armed troopers, it was justified by the need to maintain custody of the defendants, who had been denied bail, because their attendance at trial could not otherwise be secured. On the present record we can find no "impermissible factors coming into play" that prejudiced the appellants because of the security measures taken.
 
 III
 
 76
 Appellants Caballero and Tang claim that the trial court should have dismissed the indictment as to them because they were not formally extradited to the United States and their arrest in Panama was illegal. Caballero raised this point previously in a petition for a writ of habeas corpus, which was denied by the district court, and affirmed by our court in United States v. Lucas Gerrardo Caballero Salinas, No. 86-5650, (April 30, 1987, unpublished). Tang argues that his arrest and removal to the United States violated international law and treaties.
 
 
 77
 These claims of illegal arrest are covered by the Ker-Frisbie doctrine. Ker v. Illinois, 119 U.S. 436 (1886), and Frisbie v. Collins, 342 U.S. 519 (1952) hold that a defendant may not defeat personal jurisdiction by claiming that his presence in court was illegally obtained. This doctrine is still in effect. See United States v. Crews, 445 U.S. 463, 474 (1979) ("Insofar as respondent challenges his own presence at trial, he cannot claim immunity from prosecution simply because his appearance in court was precipitated by an unlawful arrest. An illegal arrest, without more, has never been viewed as a bar to subsequent prosecution, nor as a defense to a valid conviction").
 
 
 78
 Tang's arrest was made by Panamanian authorities, and he was held overnight in a Panamanian jail. He admits he was not beaten, tortured or brutalized in any way. We find no merit to his appeal to international law and various treaties between the United States and Panama. See United States v. Darby, 744 F.2d 1508, 1531 (11th Cir.1984), cert. denied, 471 U.S. 1100 (1985).
 
 IV
 
 79
 Appellants Felipe Mantecon, Phillip Mantecon and Luis Tang-Fortaleche claim that the trial judge erred in not severing their trials from the trials of Caballero and Bernardo Calleja and Carlos Calleja because the spill-over effect of the evidence against Caballero and the Callejas on the Continuing Criminal Enterprise counts unduly prejudiced Tang and the Mantecons. Rule 8(b) permits joinder of defendants if "they are alleged to have participated in the same act or transaction or in the same series of acts or transactions constituting an offense or offenses." In Kotteakos v. United States, 328 U.S. 750, 773 (1945), the Court warned "[w]hen many conspire, they invite mass trial by their conduct."
 
 
 80
 We find no abuse of the district court's discretion in denying the motion for severance under Fed.R.Crim.P. 14. In United States v. Porter, 821 F.2d 968, 972 (4th Cir.1987), we held:
 
 
 81
 A defendant must show prejudice in order for the court's ruling to constitute an abuse of discretion. United States v. Phillips, 664 F.2d 971, 1016-17 (5th Cir.1981). No prejudice exists if the jury could make individual guilt determinations by following the court's cautionary instructions, appraising the independent evidence against each defendant. Convictions should be sustained if it may be inferred from the verdicts that the jury meticulously sifted the evidence.
 
 
 82
 In the present case, the trial judge carefully instructed the jury that the evidence should be considered as to each defendant and instructed the jury, as evidence was presented, as to whom it should be considered. The judge specifically instructed the jury that certain evidence was admitted only on the count charging a Continuing Criminal Enterprise and against which defendants this evidence was to be considered. From the record it is obvious that the jury considered each defendant separately and each charge separately. The jury deliberated for almost twelve hours, it asked for reinstruction on the conspiracy and Continuing Criminal Enterprise counts and it returned not guilty verdicts on several counts.
 
 V
 
 83
 Each appellant has challenged the sufficiency of the evidence as to each count on which he was convicted. We have reviewed the record as to each count of the indictment and each appellant. We have applied the rule established in Glasser v. United States, 315 U.S. 60 (1942), that an appellate court must examine the evidence in the light most favorable to the government. We are also mindful that "[t]he relevant question is not whether the appellate court is convinced of guilt beyond a reasonable doubt, but rather whether viewing the evidence in the light most favorable to the government, any rational trier of facts could have found the defendant guilty beyond a reasonable doubt." United States v. Jones, 735 F.2d 785, 791 (4th Cir.), cert. denied, 469 U.S. 918 (1984).
 
 
 84
 Francisco C. Astorga claims that the government failed to identify him as the individual who committed the acts alleged in the indictment and failed to prove that he was involved in the conspiracy to import cocaine. The case against Astorga, like the case against most of the other appellants, is based primarily upon the testimony of Agent Lincoln. Astorga spoke very little English and Lincoln spoke little Spanish, but they were able to communicate in a limited way. The government introduced into evidence the United States Immigration and Naturalization Service re-entry permit for Astorga and it contained his photograph. This served to identify him.
 
 
 85
 One of the first times Lincoln met Astorga was at the Miami Airport on December 20, 1985. Astorga was in the company of Bernardo and Carlos Calleja. The four men entered a black Thunderbird automobile. During discussions in the automobile relating to the delays in arranging drug shipments for Lincoln to fly from Panama to the United States, Astorga gave Lincoln $10,000 in cash and approximately one ounce of white powder which later tested as cocaine. At the same meeting, Carlos Calleja also gave Lincoln $10,000. Some of this money was to go to Lincoln's pilot.
 
 
 86
 Later Lincoln was taken by Bernardo Calleja to Astorga's house at Key Biscayne and Bernardo stated that he conducted business from this house. Telephone toll records introduced into evidence showed a total of twenty-three calls from Astorga's house to numbers in Mexico. There were also calls by another conspirator. The records also showed five calls to a common number in Colombia.
 
 
 87
 On February 28, 1986, Lincoln, by chance, met Astorga in the international terminal for incoming passengers at the Miami Airport. Astorga advised Lincoln that he was coming from Mexico and had been there about the boats. The Callejas had advised Lincoln that they had lost a boat load of marijuana in this area. The jury could conclude from this inference that Astorga knew that the Callejas had advised Lincoln of the marijuana problem and that Astorga had been dispatched to handle the problem.
 
 
 88
 Astorga went by the name of "Frank" and on April 16, 1986, the Callejas advised Lincoln that "Frank" was in New York and everything was set there. The telephone logs from Astorga's house showed six calls to the home of Tang in Panama and twenty-three calls to the hotel in Panama where Lincoln and various defendants stayed.
 
 
 89
 The Mantecons also challenge their conspiracy convictions. Felipe Mantecon and Phillip Mantecon were at a meeting on February 28, 1986 at a mobile home in Miami, Florida. This was described as a "safe house" used by Castanon and the Callejas in their drug business and for keeping visiting Colombians. Present at the meeting were Agent Lincoln, Tom Warner, Felipe Mantecon, Phillip Mantecon, Luis Castanon and Bernardo Calleja. Castanon briefed the group on developments in Colombia, particularly the loss of a recent load of cocaine that had been seized in Colombia. At this meeting, Felipe Mantecon discussed with Lincoln various problems that had occurred during the week and explained that he was in radio contact three times a day with a boat load of marijuana that was coming up through the Caribbean and had been followed by a United States Coast Guard cutter. There was also discussion at this meeting of the loss of the boat near the Campeche Banks off Yucatan.
 
 
 90
 After this meeting, the two Mantecons drove Lincoln and his pilot Warner back to the airport. During this trip Felipe Mantecon told Lincoln of his dealings with the Calleja brothers and the various problems they had incurred as well as the successes they had enjoyed in bringing marijuana from Colombia to the United States. The trial judge instructed the jury that the defendants were not on trial for importing or dealing in marijuana. However, this evidence was admissible to show the relationship and prior dealings between the parties.
 
 
 91
 Felipe Mantecon also drove from Miami to Roanoke in April 1986 and delivered $95,000 in cash. He explained that this should have been $100,000 but in his haste he had not carefully counted the money before leaving Miami. He brought the money to pay off Lincoln's pilots and get the cocaine released in order that it could be distributed in Richmond, New York, and Miami. Carlos Calleja stated in Felipe Mantecon's presence that Felipe and Jorge Rodriguez were to take 100 kilograms of the cocaine back to Miami from Roanoke. Paying the pilots for flying the cocaine into the United States was a vital and necessary part of the conspiracy to import and the evidence was sufficient to sustain the conviction of Felipe Mantecon for conspiracy to import, conspiracy to possess with intent to distribute, interstate travel to promote a cocaine business and possession with intent to distribute.
 
 
 92
 Phillip Mantecon was at the meeting on February 28, 1986. He had picked up Lincoln and Castanon at the airport and drove Lincoln back to the airport following the meeting. He was also present during the meeting. Phillip Mantecon also attended a meeting on December 6, 1985 in Miami with Lincoln, Carlos Calleja and John Roush. Prior to this meeting, Carl Warmack had advised Lincoln that the Calleja brothers were interested in his flight services for the transportation of drugs. At the meeting Carlos Calleja advised Lincoln that he was interested in moving cocaine out of Bolivia and that an arrangement would be set up shortly. This meeting, on December 6, was the first time Lincoln had met Phillip Mantecon. Lincoln then told Carlos Calleja that he was disturbed about having a lot of people involved. Carlos advised Lincoln in the presence of Mantecon that "The guy works with me all the time. I trust him with my life. Anything you can tell me, you can tell him." Later, at the same meeting, Mantecon advised Lincoln that the Calleja brothers were good people. Discussion then began as to smuggling drugs out of Colombia.
 
 
 93
 Phillip Mantecon also flew to Virginia with Carlos Calleja, John Roush and Carl Warmack to inspect the airfield and the farm where the cocaine would be stored. In February, 1986, at the request of the Callejas, Mantecon flew to Panama to introduce Lincoln to one Guillermo, a cocaine supplier from Colombia. In a recorded telephone conversation Bernardo Calleja had advised Lincoln that Phillip Mantecon would be coming to Panama for this purpose. When Mantecon arrived, he met with Lincoln and Tang. This meeting was video-taped, and the tape was shown to the jury. It was very strong evidence that Phillip Mantecon was intimately involved in the conspiracy. There is sufficient evidence to support his convictions for conspiracy to import cocaine, interstate travel to promote the cocaine business, and conspiracy to possess with intent to distribute more than one kilogram of cocaine.
 
 
 94
 John Joseph Roush was convicted only of Count One, conspiracy to import more than one kilogram of cocaine into the United States. Roush was referred to at various times as Rubio. He attended the meeting on December 6, 1985 in Miami, mentioned above, and he was questioned by Lincoln about the Calleja brothers. Roush responded that he was a close personal friend of Carl Calleja and that he had worked with him for years and that he could vouch for both brothers. He claimed that they were substantial and well respected in the drug business in Miami and that he had been working with them. The evidence also shows that Roush, with Carlos Calleja, Warmack and Phillip Mantecon, traveled to Virginia to inspect the area where the drugs were to be landed. Toll records showed extensive calls between telephones associated with Roush and numbers associated with the Callejas and Carl Warmack. The evidence was sufficient to sustain this conviction.
 
 
 95
 Luis Tang-Foraleche was identified by Bernardo Calleja as his "man in Panama." Tang was convicted under the Count One conspiracy and also under Count Nine--importation of cocaine into the Western District of Virginia. The evidence shows that on January 14, 1986, Tang met with Bernardo Calleja and Lincoln at the Marriott Hotel in Panama and discussed various loads of drugs to be flown. At that time Tang agreed to go to Cali, Colombia the next day to work out a deal to bring cocaine base out of Colombia. There were also discussions of a 700 kilogram load to be brought from Bolivia. On January 17, 1986, at another meeting between the same individuals, Tang reported that he had been to Cali as planned and discussed his trip. On February 5, Tang delivered $5,000 to Lincoln, on February 7, he delivered another $5,000 to Lincoln, and on February 17, 1986, he delivered $15,000 to Lincoln and stated that it was from the Callejas. In February 1986, Tang was also present at a meeting with Lincoln and Caballero in Panama. There was also a meeting on February 25, 1986 involving Tang, Castenon, Lincoln, Special Agent Driver, Tom Warner and Orlando Arenas-Silvas. This meeting was videotaped and involved a discussion of an airstrip location. Tang also told Lincoln that when Caballero needed money, he had money delivered to him from the Callejas. On April 1, 1986, Lincoln received a telephone call from Carlos Calleja in which Carlos stated that he had told Tang to deliver $5,000 to Lincoln. Shortly thereafter, Tang made the delivery. On the date of his arrest, Tang received a telephone call from Agent Driver reporting on his mission to Bolivia. Driver advised Tang that the Suarez family had sent him the gift of one kilo of cocaine and he could come pick it up. When Tang arrived to pick up the gift, he was arrested. There was sufficient evidence to sustain the convictions of Tang.
 
 VI
 
 96
 Bernardo Calleja, Carlos Calleja, and Felipe Mantecon claim that there is not sufficient evidence to support their convictions under Count Thirteen of possession with intent to distribute approximately 50 kilograms of cocaine. On this count the indictment charges a violation of 21 U.S.C. Secs. 841(a)(1), 841(b)(1)(A), 841(b)(1)(B), and 18 U.S.C. Sec. 2.[2] It is the aiding and abetting language of 18 U.S.C. Sec. 2 that snares them.
 
 
 97
 Appellants argue that they never had actual or constructive possession of the 50 kilograms of cocaine because it was never released to them by Lincoln and they never had it under their dominion and control. When the cocaine arrived in Roanoke, Agent Lincoln refused to release it until he received money for his pilots. The Callejas had agreed to pay $100,000 and they were to take 100 kilos to New York. One hundred kilos was to go back to Miami. The New York kilos were to be placed in a Monte Carlo belonging to Miguel Alvarez. Bernardo Callejo was to follow Alvarez in a second car. Lincoln and another agent went to Carlos Calleja's motel and picked up the Monte Carlo. They were to load it with 100 kilos for New York, but they placed only 50 kilos in the trunk of the Monte Carlo. Shortly thereafter Carlos Calleja advised Lincoln to come to the Best Western Motel because everything was ready and the money was there. Lincoln and two other agents drove the Monte Carlo to the Best Western and met with both Calleja brothers, Miguel Alvarez, Felipe Mantecon and Jorge Rodriguez. Carlos Calleja advised Lincoln that everything was fine and showed him the money, which was in a plastic bag on the bed. At this point Mantecon explained that there was only $95,000 and not the $100,000 as promised. Lincoln advised the group that the cocaine was in the back of the Monte Carlo and the keys to the car were handed to Carlos Calleja, who handed them to Alvarez. Lincoln asked the group if they did not want to see the cocaine in the automobile. He wanted to get some of them out of the room because he did not want to be outnumbered at the time of the arrest, which was to take place momentarily. Bernardo Calleja indicated that they trusted Lincoln and did not need to view the cocaine packed in the automobile.
 
 
 98
 At this point it was necessary to get some of the appellants out of the room, so Agent Burroughs advised Carlos Calleja that he had a present for him in the car. Burroughs and Calleja went to the car but found that they did not have the keys. Alvarez then dropped the keys from the balcony of the motel to Calleja, and when Carlos Calleja opened the trunk he and the appellants present in the motel were arrested.
 
 
 99
 The government contends that when Carlos Calleja and Alvarez took the keys to the Monte Carlo, they and Bernardo Calleja had actual dominion and control over the automobile and the 50 kilos of cocaine in the trunk, and that this was sufficient constructive possession to sustain a conviction even though the time of possession of the keys was brief. As to Carlos Calleja and Miguel Alvarez, this was sufficient under United States v. Damsky, 740 F.2d 134 (2d Cir.), cert. denied, 469 U.S. 918 (1984). The fact that the cocaine had not been released by the government agents, and they did not intend to release it, does not change the fact that the keys gave Carlos Calleja and Alvarez dominion and control over the car and thereby constructive possession of the cocaine in the trunk. See United States v. Vera, 701 F.2d 1349, 1357 (11th Cir.1983).
 
 
 100
 The convictions of Bernardo Calleja and Felipe Mantecon are not based upon actual or constructive possession of the cocaine by possession of the keys to the Monte Carlo. They were convicted under 18 U.S.C. Sec. 2 of aiding and abetting in the possession of the cocaine with intent to distribute it. This requires proof of aiding and abetting in the possession and aiding and abetting in the intent to distribute. United States v. Fischel, 686 F.2d 1082 (5th Cir.1982). Mere presence at the scene of the crime or mere association with persons engaged in illegal activity is not sufficient to establish that one is guilty of aiding and abetting. United States v. Larson, 760 F.2d 852 (8th Cir.1985). Aiding and abetting requires that there be a community of unlawful intent between the aider and abettor and the principal. United States v. Phillips, 664 F.2d 971 (5th Cir.1981), cert. denied, 459 U.S. 906 (1982). "In order to aid and abet another to commit a crime, it is necessary that a defendant 'in some sort associate himself with the venture, that he participate in it as in something that he wishes to bring about, that he seeks by his action to make it succeed' ". United States v. Batimana, 623 F.2d 1366, 1369-70 (9th Cir.1980) (quoting United States v. Peoni, 100 F.2d 401, 402 (2d Cir.1938) (L. Hand, J.)), cert. denied, 449 U.S. 1038 (1981).
 
 
 101
 Felipe Mantecon transported $95,000 from Miami to Roanoke for the purpose of paying the pilots and securing the release of the cocaine that had been imported. Without the payment of this money, the cocaine would not be released and could not be distributed. In so doing, Felipe Mantecon not only associated himself with the possession with intent to distribute, but he made such possession possible by bringing the money required to obtain possession. He was also well aware of the plan to distribute the cocaine in New York and in Miami. The evidence against Bernardo Calleja is equally strong. He was one of the major players in the plan. He had associated himself with the scheme from the beginning, and he was not a mere bystander or one whose presence at the scene of the crime was accidental. He had associated himself with the venture and participated in it. In the plan to distribute, Bernardo Calleja was to follow the Monte Carlo, which was loaded with the cocaine, to New York. Although he never possessed the car keys, the jury could draw a reasonable inference from the testimony that he was aiding and abetting the possession with intent to distribute.
 
 VII
 
 102
 Bernardo Calleja and Carlos Calleja claim that the evidence was not sufficient to convict them on the Continuing Criminal Enterprise count, because there was no proof that there was a continuing series of violations. They also claim error in the court's jury instruction on this count, because they contend that the instructions did not specifically state that each statutory element of the offense must be proved beyond a reasonable doubt.
 
 
 103
 The Continuing Criminal Enterprise offense is established by 21 U.S.C. Sec. 848 (1985). Sub-section (b) provides:
 
 
 104
 (b) "Continuing criminal enterprise" defined
 
 
 105
 For purposes of sub-section (a) of this section, a person is engaged in a continuing criminal enterprise if--
 
 
 106
 (1) he violates any provision of this subchapter or subchapter II of this chapter the punishment for which is a felony, and
 
 
 107
 (2) such violation is a part of a continuing series of violations of this subchapter or subchapter II of this chapter--
 
 
 108
 (A) which are undertaken by such person in concert with five or more other persons with respect to whom such person occupies a position of organizer, a supervisory position, or any other position of management, and
 
 
 109
 (B) from which such person obtains substantial income or resources.
 
 
 110
 In United States v. Lurz, 666 F.2d 69, 75 (4th Cir.1981), cert. denied, 459 U.S. 843 (1982), we defined the five elements of the offense:
 
 
 111
 1) a felony violation of the federal narcotics laws;
 
 
 112
 2) as part of a continuing series of violations;
 
 
 113
 3) in concert with five or more persons;
 
 
 114
 4) for whom the defendant is an organizer or supervisor;
 
 
 115
 5) from which he derives substantial income or resources.
 
 
 116
 The elements are divided into two parts. First, it is necessary to prove the predicate felony violation (element one), and second, the other elements must be proved.
 
 
 117
 Count Fifteen of the superseding indictment contains a Continuing Criminal Enterprise count against Bernardo Calleja and alleges as felonies and as a continuing series of violations Counts One, Five, Six, Seven, Nine and Thirteen of the indictment. Count Sixteen is the Continuing Criminal Enterprise against Carlos Calleja and it alleges as felonies and a continuing series of violations the offenses contained in Counts One, Seven, Nine and Thirteen.
 
 In Lurz at page 76-77, we stated:
 
 118
 The definition of a continuing criminal enterprise is divided into two parts. First, as one distinct element, a person must violate the federal narcotics laws, and second, as a separate element, the violation must be a part of the continuing series of violations (element two) meeting the other requirements delineated above as elements three through five. The message is clear. The first element is the gravamen of the offense, and the others merely constitute a series of aggravating factors which, when present, require a greater punishment. In the final analysis, Sec. 848 is a variant of recidivist statutes.
 
 
 119
 Bernardo Calleja was convicted of six different felonies under the federal narcotics laws and Carlos Calleja was convicted of four different violations of such laws. Element two violations may include conspiracies, United States v. Ricks, 802 F.2d 731, 737 (4th Cir.1986) (en banc), and they may include telephone counts, United States v. Young, 745 F.2d 733, 755 (2d Cir.1984), cert. denied, 470 U.S. 1084 (1985). Possession with intent to distribute cocaine is also a conviction that may be used as an aggravating factor under element two. Both were convicted of possession with intent to distribute.
 
 
 120
 We next consider the management element of the offense and the requirement that there be five or more persons. In United States v. Rhodes, 779 F.2d 1019, 1026 (4th Cir.1985), cert. denied, 106 S.Ct. 2916 (1986), we stated:
 
 
 121
 We agree with the Ninth Circuit's construction of Sec. 848 and hold that the five other persons mentioned in the statute need not be under a defendant's supervision at the same moment nor in the conduct of the same underlying felony. It is enough that they are found to be under the defendant's supervision in the conduct of the same continuing criminal enterprise, as here.
 
 
 122
 In Lurz at page 80, we held that it is not necessary to show that the defendant is the top manager or only manager:
 
 
 123
 A cursory review of the statute suffices to establish that there may be a kingpin and not solely the kingpin. The definition of the crime speaks in terms of "any person," Sec. 848(a)(1), and of "a person," Sec. 848(b). Whatever the statute's popular name, there is no indication that it can be applied to only one dominant participant in a conspiracy.
 
 
 124
 There was sufficient evidence for the jury to infer that each of the Callejas supervised, organized or managed more than five people. There was testimony about the extensive marijuana operations of the Callejas. Two of their boats, the Crusader and the Fermin II, were mentioned by name and another boat that was lost in a smuggling trip. There was testimony that Carlos was in charge of operations and Bernardo was in charge of handling the money, finances and negotiations. There was also substantial evidence as to the amounts of money involved. If we consider only the payments made to Agent Lincoln, either directly or indirectly by the Callejas, the total is $185,000. All of the elements were made out to sustain a conviction of both Calleja brothers under 21 U.S.C. Sec. 848.
 
 
 125
 We have reviewed the judge's instructions, and we find no merit to the claim that he did not properly instruct the jury on the elements of the Sec. 848 violation and the degree of proof required for conviction.
 
 VIII
 
 126
 Gerrardo Caballero was convicted on Count One, conspiracy to import more than one kilo of cocaine into the United States, Count Seven, conspiracy to possess with intent to distribute more than one kilo of cocaine, Count Eight, distribution of approximately 342 kilos of cocaine, Count Nine, importing approximately 318 kilos of cocaine into the Western District of Virginia, and Count Fourteen, engaging in a Continuing Criminal Enterprise. After the verdict, Caballero moved for a judgment of acquittal on the Continuing Criminal Enterprise count. His attorneys claimed that he was no more than a messenger in the organization and that the court should disregard Caballero's claims of his importance and his many drug related activities. The trial judge found that Caballero was simply "puffing" his importance and that the testimony of other individuals as to his position in the organization should be excepted. Therefore, the court granted the motion and acquitted Caballero on Count Fourteen. The government has appealed, and we reverse.
 
 
 127
 It is an unusual case when a court decides that a defendant was not telling the truth when he boasts of his position in a criminal organization and then describes his activities that violated the law. There were tapes of Caballero making his various claims, and the jury obviously believed the tapes and the other evidence presented in reaching its determination that the government had proved the essential elements of the Continuing Criminal Enterprise count beyond a reasonable doubt. In granting the motion for judgment of acquittal after the jury verdict, the court has gotten itself into a position of passing upon credibility, and this it may not do.
 
 
 128
 Taking the evidence in the light most favorable to the government, which we are required to do, there was sufficient evidence to sustain Caballero's conviction on Count Fourteen. He was found guilty of four violations of the federal drug laws in Counts One, Seven, Eight, and Nine. He stated that he had sold over $5,000,000 in cocaine during the preceding two years through one distribution line and that he had established another. He claimed that he had arranged for Colombians to process base into cocaine hydrochloride and he wanted Lincoln to transport it into the United States. According to his testimony, he supervised at least five persons including a banker, a pilot, and those involved in distribution. The testimony was sufficient for the jury to find that he organized and managed the processing, packaging, guarding and loading of the cocaine that was eventually seized in Roanoke. The value of the 342 kilos seized was in excess of $7,000,000. He made numerous trips from Bolivia to the United States in 1984 and 1985 and, according to travel records, was out of Bolivia 130 days during that time.
 
 
 129
 One view of Caballero's statements could be that he was trying to impress the other defendants with his importance, when in fact he was no more than a messenger for Suarez. However, the jury could, and apparently did, take the other view. It believed enough of Caballero's statements to satisfy the elements of the crime. There was enough corroborating evidence supporting Caballero's claims to make them more believable.
 
 IX
 
 130
 We find no merit to claims that the district court erred in admitting evidence of various defendants' involvement in the importation of marijuana. The judge was careful to instruct the jury that the defendants were not on trial for dealing in marijuana, but the evidence was relevant under Federal Rule of Evidence 404(b) to show prior association, intent and knowledge of the scope of the drug crimes charged. There were also statements made contemporaneously with statements involving the importation of cocaine. We find no abuse of the district court's discretion in admitting the numerous tape recordings of conversations of the defendant, nor do we find any merit to the claim of prosecutorial misconduct in the government's closing argument.
 
 
 131
 We have carefully reviewed the other claims of error and find them to be without merit.
 
 
 132
 The case is remanded with directions that the verdict of guilty as to Caballero on Count Fourteen of the indictment be reinstated and that Caballero be sentenced on this Count. The Court may reconsider the other sentences of Caballero and resentence him as to any of his other convictions as the Court may deem proper. The sentences of Bernardo Calleja and Carlos Calleja under Counts One and Seven shall be set aside. In all other respects, the judgments of the district court are affirmed.
 
 
 133
 AFFIRMED IN PART, REVERSED IN PART, AND REMANDED WITH INSTRUCTIONS.
 
 
 
 [1]
 Defendant Miguel Alverez was convicted on two counts and has withdrawn his appeal, and defendant Carl Allen Warmack was convicted of five counts and his appeal has been severed (No. 87-5021)
 
 
 [2]
 18 U.S.C. Sec. 2. Principals
 (a) Whoever commits an offense against the United States or aids, abets, counsels, commands, induces or procures its commission is punishable as a principal.
 (b) Whoever willfully causes an act to be done which if directly performed by him or another would be an offense against the United States, is punishable as a principal.